IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEIA YATES, LEONARDO RODRIQUEZ, and JOHNNY JIMMERSON, as representative of that class of individuals working as Aviation Security Officers of the City of Chicago, Department of Aviation, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF ILLINOIS, BRENT FISCHER, as Executive Director of the Illinois Law Enforcement Training and Standards Board; the CITY OF CHICAGO; and GINGER EVANS, as Commissioner of the City of Chicago Department of Aviation, <br><br> Defendants. | Case No. 18 C 2613 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Keia Yates, Leonardo Rodriquez and Johnny Jimmerson, on behalf of themselves and other similarly situated individuals working as Aviation Security Officers of the City of Chicago, Department of Aviation, have brought a four count putative class action complaint[1] against defendants State of Illinois and Brent Fischer as Executive Director of the Illinois Law Enforcement Training and Standards Board ("ILETSB") (jointly, the "State defendants"), and the City of Chicago and Ginger Evans as Commissioner of the City of Chicago Department of Aviation ("CDA") (jointly, the "City defendants"). Counts I and II are brought pursuant to 42 U.S.C. § 1983 and allege violations of the Fifth Amendment's Taking Clause and

---

[1] The complaint is titled "Class Action Complaint," but contains no class allegations or a proposed class definition.

the Fourteenth Amendment's Due Process Clause respectively. Counts III and IV are state law claims for fraudulent inducement and promissory estoppel. All claims are brought against all defendants. The State defendants and the City defendants have each brought separate motions to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the reasons described below, the State defendants' motion is granted in full, and the City defendants' motion is granted in part and denied in part.

## BACKGROUND[2]

According to the complaint, in approximately 1982 the City of Chicago amended its municipal code to create the position of Aviation Security Officer ("ASO") to serve a security function within the CDA at O'Hare International and Midway International airports. The airports are generally divided into two areas: (1) the "Land Side," which are areas open to the public; and (2) the "Air Side" which are secured areas such as the airfield, terminals and other restricted areas. The ASOs were responsible for securing the Air Side.

Sometime in 1993 the City applied to the State for the CDA to be recognized as a law enforcement agency ("LEA"). The application was granted, giving the CDA the ability to send its officers to the Chicago Police Academy and/or the Cook County Sheriff's Training Academy for law enforcement training. Only a designated LEA can send its employees or probationary employees to those training academies. Since 1993, every ASO hired by the CDA, including plaintiffs, have been required to gain acceptance into and graduate from either of the two

---

[2]The background facts are taken from plaintiffs' complaint and are presumed true for resolving defendants' motions to dismiss. Firestone Financial Corp. v. Meyer, 796 F.3d 822, 826 (7th Cir. 2015).

academies, be sworn in as an officer, and become certified as a law enforcement officer ("LEO") by defendant ILETSB. Each ASO hired since 1993 through June of 2017 who completed those requirements received LEO certification and a corresponding LEO ID Number.

In addition, each ASO hired since 1993 was given an employment manual which provided:

> Aviation Special Police Officers will be state certified law enforcement officers. They will be commissioned by the Superintendent of Police of the City of Chicago Police Department as Special Police Officers and will have the authority to make arrests while enforcing state laws and City of Chicago ordinances as specified by the Managing Deputy Commissioner, Security, while on Department of Aviation property.
>
> . . .
>
> Special Police will possess all the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged.

Every ASO since 1993 has been required to recertify and retest with the ILETSB every year, like every other LEO in the state, or be terminated by the CDA. Until June 2017, failure to graduate from one of the two training academies, or failure to pass recertification testing with ILTESB every year, resulted in termination from the CDA. In addition, the City and the State have required ASOs to testify in court as police officers, have prosecuted individuals for aggravated assault on ASOs as police officers, and assigned ASO's police vehicles.

Since 1993 the CDA has consistently advised applicants of the requirements and benefits of the position as an ASO, including the right to receive LEO status. That status grants each LEO rights and opportunities not available to others not so certified, such as carrying a concealed weapon without a conceal carry permit while serving and in retirement under the Federal Law

3

Enforcement Officer Safety Act, 18 U.S.C. § 926B, C.  Certified LEOs are permitted to carry concealed weapons in any jurisdiction in the United States without standard certification under local or state laws, and can "generally" transfer among LEAs laterally and "typically" are not required to retrain or recertify under that jurisdiction's police training academy.  Additionally, and perhaps most importantly for the instant case, LEOs "typically" are not subject to the age restrictions applicable to new hires and receive credit for time served working as LEOs in other jurisdictions.

After the World Trade Center attacks in 2001 and the creation of the Transportation Safety Administration ("TSA"), the CDA officially renamed ASOs as "Aviation Police Officers" ("APOs").  In doing so the City and CDA revised all documents and signs to indicate Aviation Police rather than Aviation Security.  The CDA held the officers out as "police" in a number of ways, including giving them 5-point star badges, which are provided only to law enforcement officers, and providing APOs with patrol cars that had flashing red and blue emergency lighting, which in Illinois is restricted to law enforcement vehicles.

Plaintiffs claim that everything changed on April 9, 2017, when APOs at O'Hare Airport were dispatched to United Flight 3411 to respond to a call from the flight crew about a non-compliant passenger.  Several APOs responded and eventually physically removed the passenger from the plane.  Videos of the event went viral on social media and news outlets across the county, alleging abuse by Chicago Police Officers.  One video showed an APO dragging the passenger down the aisle.  The video showed the back of the APO's vest indicating "POLICE."

One month later, Commissioner Evans was called to testify before the U.S. Senate Subcommittee on Aviation Operations, Safety and Security. Evans repeatedly testified that the officers involved with the flight 3411 incident were not police officers but rather "Aviation Security Officers," and were "non-sworn, non-armed security personnel." She also promised to institute several changes to policies, procedures and training. Since her hearing, Evans has publicly stated that APOs "are not, and have never been, police."

On April 5, 2017, just four days before the flight 3411 incident, the ILETSB had sent a letter to the First Deputy Chief of Staff for the City, indicating that in the early 1990s the ILETSB had been informed that ASOs were City employees "duly authorized to make arrests, trained and certified in the same manner as Chicago Police Officers and under the appointment of the CPD Superintendent as 'Special Police' Officers." The letter indicates that for those reasons the ASOs were "deemed 'law enforcement officers' employed within a special division of the Chicago Police Department." The letter (attached to the instant complaint) indicates that the Board had come to learn that APOs were not authorized to carry firearms on or off duty, that decisions of the Illinois Labor Relations Board ("ILRB") had repeatedly determined that ASOs were not LEOs, and that the chain of command for ASOs ended with the Chairman of the CDA but "at no point is the Superintendent [of CPD] involved in their direction or command." The letter then indicated that as a result the board could not "trace law enforcement authority from the Illinois statutes to these particular employees, in the manner that we can for CPD officers, and we can no longer find them [to] be law enforcement officers." The final paragraph of the letter provides:

> At this time, we respectfully ask the City to define the moment when these employees were pulled from the jurisdiction of the Superintendent and placed wholly under the direction of the Department of Aviation – this will allow us to determine when aviation employees ceased serving as "law enforcement officers" under the Police Training Act. This has become relevant as the Board must regularly verify the status of retired law enforcement officers who are eligible for certain firearm privileges under the federal Law Enforcement Officers Safety Act after serving as a law enforcement officer for ten years.

Plaintiffs allege that the ILETSB knew that the CDA "was an independent LEA and had recognized it as such separate and apart from the Chicago Police Department when it assigned the CDA its own LEA ID Number." Plaintiffs further allege, on information and belief, that the April 5, 2017, letter was actually drafted later and was intended to "create the false impression that its decision to decertify the CDA and APO was independent of – and arose <u>before</u> – the United Airlines Flight 3411 incident."

According to plaintiffs, after the Flight 3411 incident the City decided to strip APOs of their police status. As a result, the APOs' Union brought an unfair labor charge with the ILRB. The City and the Union engaged in settlement discussions and on May 18, 2017, the Union received a draft Letter of Agreement from the City specifying that APOs would no longer be recognized as police, special police, or peace officers, and that their title would be changed to Aviation Public Security Officers.

On June 15, 2017, the Union rejected that Letter of Agreement. That same day the ILETSB sent a follow-up letter to the City indicating that it had received no response to its earlier (April 5) letter, and that it was concluding that the pertinent date identifying when the APOs were reorganized and no longer under the direction and control of the Superintendent is not known, and thus it determined that APOs are not "law enforcement officers as defined by the

Police Training Act." The letter indicated that new hires would be precluded from attending an approved law enforcement training academy. The letter further provided:

> By way of administration, officers who received their training and certification as employees of the CDA will remain certified officers; however, time served as an employee of this entity will not qualify towards any law enforcement benefits or credentials as maintained by the Board. Because no date of reorganization could be identified, and to protect the interests of the employees at issue, the Board will deactivate the CDA and administratively separate the individuals on the subject roster as of July 1, 2017.

On June 20, 2017, Joseph Martinico of the City Law Department responded to the ILETSB, indicating that he had responded earlier and including a copy of a May 19 letter. In the June 20 letter, Martinico indicated that the "City's Aviation Security Officers do not receive any certification or appointment from the Chicago Police Superintendent, are under the supervision of the Commissioner of the CDA, and serve as an unarmed security function and are not police officers or special police officers under the Chicago Municipal Code."

Based on Martinico's letter, the ILETSB, on June 29, 2017, indicated that it would deactivate the CDA as a LEA and administratively separate all personnel currently listed on that roster effective on the close of June 30, 2017. The letter further provided:

> As soon as possible, the respective authorities should inform all employees of this agency that they are not law enforcement officers under the Police Training Act and have no authority as such to make arrests or carry firearms. Any individual who completed a basic law enforcement academy and passed the state certification exam shall be reflected as a certified officer within the Board's records; however, time employed by the CDA shall not be credited as "law enforcement" employment in any capacity, including, but not limited to, subsequent employment and participation in the Illinois Retired Officer Concealed Carry program.

## **DISCUSSION**

Both sets of defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Such a motion challenges the sufficiency of the complaint, not its merits. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor. Sprint Spectrum, L.P. v. City of Carmel, Indiana, 361 F.3d 998, 1001 (7th Cir. 2004). The complaint must allege sufficient facts, that if true, would raise a right to relief above the speculative level, showing that the claim is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 549, 555 (2007). To be plausible on its face, the complaint must plead facts sufficient for the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Ashcroft v. Iqbal, 556 U.S. at 678 (2009).

**A.      The State Defendants**

The State defendants first argue that the claims brought against them violate the Eleventh Amendment. The court agrees. The Eleventh Amendment "bars actions in federal court against the state, state agencies, or state officials acting in their official capacities." Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin., 603 F.3d, 365, 370 (7th Cir. 2010) (citing Edelman v. Jordan, 415 U.S. 651, 662-63 (1974)). There are three exceptions: "(1) where Congress, acting under its constitutional authority conveyed by amendments passed after the Eleventh Amendment (like the Fourteenth Amendment), abrogates a state's immunity from suits; (2) where the state itself consents to being sued in federal courts; and (3) under the doctrine articulated by the Supreme Court in Ex Parte Young, 209 U.S. 123." Chester Bross Construction Co. v. Schneider, 886 F. Supp.2d 896, 903-04 (C.D. Ill. 2012) (quoting Council 31

of the Am. Fed'n of State, County and Mun. Emps., AFL-CIO v. Quinn, 680 F.3d 875, 882 (7th Cir. 2012).

In the instant case, plaintiffs' claims against the state and/or ILESTB, an agency of the state, are barred by the Eleventh Amendment. The state has not consented to suit against it or the agency and Congress has not abrogated the state's or the ILETSB's immunity. Consequently, all claims against the state are dismissed.

Plaintiffs have also sued Fischer in his official capacity as Executive Director of the ILETSB.[3] Suits brought against individuals in their official capacity are treated as suits brought against the governmental entity itself and are generally redundant. See Drager v. Village of Bellwood, 969 F.Supp.2d 971, 977 (N.D. Ill. 2013). Under Ex parte Young, however, "a private party may sue individual state officials in federal court to obtain prospective relief for an ongoing violation of federal law." MCI Telecomms. Corp. v. Ill. Bell Tele. Co., 222 F3d. 323, 345 (7th Cir. 2000). "Sovereign immunity does not apply because an official who acts unconstitutionally is stripped of his official or representative character." Penhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 104 (1984). This principle does not extend to suits seeking retroactive relief because "to do so would effectively eliminate the constitutional immunity of the States." Id. at 105.

Thus, to determine whether Ex parte Young allows plaintiffs' claims against Fischer, the court must question "whether [the] complaint alleges an ongoing violation of federal law and

---

[3]The complaint does not expressly state that Fischer is sued in his official capacity, but names him as Executive Director of the ILETSB. When a complaint fails to specify the capacity of an individual defendant, the court presumes the person to be named in an official capacity. See Yeksigian v. Nappi, 900 F.2d 101, 104 (7th Cir. 1990).

seeks relief properly characterized as prospective." Ind. Prot. & Advocacy Servs., 603 F.3d at 371.

The answer to that question is no. Plaintiffs do not allege that defendants are continuing to violate federal law; instead they seek retroactive relief. Their claim is that defendants have wiped out their past work history as certified LEOs. Paragraph 763 of the complaint makes this clear:

> While the City of Chicago and the State of Illinois can, at the stroke of a pen, change plaintiffs' titles and status to suit their political need, they cannot alter history and cannot deprive plaintiffs of their rights and privileges guaranteed unto them by virtue of their time served as bona fide law enforcement officers.

Again, in their brief, plaintiffs state that they "did not initiate this action because defendants stripped away plaintiffs' badges or prospectively altered their job titles and duties. That is a fight for a different day in a different forum." Again, they state in their response brief that they "do not challenge the City's right or authority to change plaintiffs' status from LEOs to Airport Security Officers on a prospective basis. . . . Instead, plaintiffs challenge the City's and State's authority to retrospectively alter – to in effect, erase their employment history . . . ." What that means is that plaintiffs are simply seeking restoration of benefits already earned, but are not alleging that they are entitled to earn these benefits in the future. They are seeking retrospective relief. As such, the claims are not protected by Ex parte Young and are dismissed.

**B.    The City Defendants**

The City defendants are in a different position because they are not arms of the state and do not have Eleventh Amendment immunity. As to Evans, however, like Fischer, she is sued in

10

her official capacity, meaning that the claims against her are treated as claims against the City and as such are redundant and dismissed. Drager, 969 F.Supp.2d at 971.

The City argues that the complaint must comply with the requirements for municipal liability under Monell v. Dept. of Social Servs. of City of New York, 436 U.S. 658 (1978). Under Monell, a municipality may be liable for an employee tortfeasor's actions only if the tortfeasor inflicts a constitutional injury on the plaintiff in the execution of the municipality's policy or custom. The municipality's policy or custom must deprive the claimant of his constitutional rights. Petty v. City of Chicago, 754 F.3d 416, 424 (7th Cir. 2014). Thus, plaintiffs must allege both that they suffered a constitutional violation, and that that violation resulted from the City's municipal policy, custom or practice. The City challenges both elements.

First, the City argues that the complaint fails to allege a constitutional violation because plaintiffs' "work history" does not constitute property for purposes of either the Fifth Amendment's Taking Clause, or the Fourteenth Amendment's Due Process Clause.

The Taking Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use without just compensation." "But the Takings Clause does not apply when property is retained or damaged as a result of the government's exercise of its authority pursuant to some power other than the power of eminent domain." Johnson v. Manitowoc County, 635 F.3d 331, 336 (7th Cir. 2011). "Property, as used in the Takings Clause, is defined much more narrowly than in the Due Process Clause." Pittman v. Chicago Board of Education, 64 F.3d 1098, 1104 (7th Cir. 1995). It extends only to real and personal property, including intellectual property, but not to contracts or statutory entitlements. Id.

In the instant case, even if plaintiffs' work history could be considered property for the Takings Clause purposes (it cannot), their histories were not "taken" under eminent domain. Nor have they, or can they, allege that the "takings" were for public use. Consequently, Count I fails to allege a constitutional violation and is dismissed.

Count II is another matter. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security interests that a person has already acquired in specific benefits. These interests – property interests – may take many forms." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972). In the instant case, plaintiffs claim that they had acquired certain benefits from having worked for CDA as LEOs for what they had always been told was and defendants treated as a "certified" LEA.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." Id. at 577.

The Constitution itself does not create any property rights. Such rights are created, and their dimensions are defined by "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits that support claims of entitlement to those benefits." Id. Thus, for example, in Goldberg v. Kelly, 397 U.S. 254 (1970), the Supreme Court held that welfare recipients had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility of those payments. Although those recipients had not yet shown that they were in fact within the statutory terms of eligibility,

the Court held that they had a right to a hearing at which they might attempt to do so. See Roth, 408 U.S. at 577.

In the instant case, state law defines a "permanent police officer" as a law enforcement officer who has completed "the probationary period and is employed on a fulltime basis as a local law enforcement officer by a participating local governmental unit . . . ." A Law Enforcement Officer is defined as any police officer of a local governmental agency who is primarily responsible for prevention or detection of crime and the enforcement of the criminal code, traffic or highway laws of the state. 50 ILCS 705/2.

Plaintiffs allege that in 1993 the state certified and recognized the CDA as an LEA for purposes of the Act. Plaintiffs further allege that they were hired, required to attend police training at a certified police academy, and were credited by the state as LEOs. They were told by the City that they were hired as special police officers, and for thirty years the state treated them as police officers, including treating their years of service with CDA as years of service with an LEA, qualifying them for LEO benefits and credentials as maintained by the ILETSB.

Finally, the complaint alleges that the City has reversed the position it held for years and now maintains the CDA "officers" were never qualified as LEOs under the Act. As a result, the State has retroactively determined that no CDA police officer is entitled to credit as an LEO. How that affects plaintiffs' ability to transfer laterally, how it affects retired APOs who are now not considered retired LEOs, and how it affects APOs who transferred laterally based on years of service with CDA remains to be seen. What is clear, however, is that plaintiffs have plausibly alleged a legitimate claim of entitlement to credit for service with CDA, and that that credit has

13

been taken without procedural due process. The complaint thus plausibly alleges a violation of the Fourteenth Amendment.

The City also argues that even if plaintiffs have alleged a property right, plaintiffs have failed to allege any injury as a result of a municipal policy or practice. But, the Chicago Municipal Code § 2-20-30 expressly vests Evans as Commissioner of CDA, with the power to designate those employees in the CDA that "shall have full police powers." Plaintiffs allege that Evans divested them of their police powers and did so retroactively causing them injury to their benefits and service credits earned as LEOs. They have plausibly alleged that their injuries were caused by a decisionmaker with authority. Consequently, the court concludes that Count II states a claim.

In Count III, plaintiffs attempt to allege a claim for fraudulent inducement.[4] To state a claim for fraudulent inducement plaintiffs must allege: (1) a false statement of material fact; (2) defendants' knowledge that the statement was false; (3) defendants' intent to induce plaintiffs to act; (4) plaintiffs' reliance on the truth of the statement; and (5) damages resulting from that reliance. Connick v. Suzuki Motor Co. Ltd., 174 Ill.2d 482, 496 (1996); Mission Measurement Corp. v. Blackbaud, Inc., 287 F.Supp.3d 691, 722 (N.D. Ill. 2017). Defendants' knowledge of the falsity or deliberate concealment with intent to deceive is an intentional element of a common law fraud claim. Fox v. Heimann, 375 Ill.App.3d 35, 47 (1st Dist. 2007).

In the instant case, the complaint alleges that at the time they were hired plaintiffs were told that ASOs would be state certified LEOs commissioned by the Superintendent of the CPD

---

[4]Although the count seeks relief against all defendants, it contains factual allegations against the City only.

as special police officers, and that plaintiffs relied on those statements to take and retain the position. What the complaint fails to allege is that the statements were false when made and that the City knew that the statements were false. Indeed, such an allegation would be inconsistent with plaintiffs' whole theory that both the City and State consistently considered plaintiffs to be and treated plaintiffs as LEOs earning years of service credit for their work with CDA. Plaintiffs' claim is that the City reversed its position after the Flight 3411 incident, now claiming that those representations were false. Thus, their claim that LEO status was "taken away retrospectively" is inconsistent with a claim that the statement was false when made. Indeed, paragraph 1 of the complaint states that "for nearly three decades the City of Chicago's Department of Aviation and the . . . ILETSB have recognized the members of the Chicago Aviation Police as bona fide law enforcement officers." Again, in paragraph 47 of the complaint, plaintiffs allege that "until United Flight 3411 there has never been a genuine dispute that APOs served as LEOs."

Because the complaint fails to allege that the City knew that the statements made to plaintiffs were false when made, Count III fails to state a claim and is dismissed.

In Count IV, plaintiffs assert a claim against the City for promissory estoppel. To state a claim for estoppel against a municipality plaintiffs must allege that the City affirmatively acted; the affirmative act induced substantial reliance; and plaintiffs substantially changed their position as a result of their justifiable reliance. Williams v. Office of the Chief Judge of Cook County, Illinois, 839 F.3d 617, 625-26 (7th Cir. 2010). The affirmative act must be either by the City itself, such as legislation, or by an official with express authority to bind the City. Patrick Eng'g Inc. v. City of Naperville, 2012 Ill. 113148, ¶39 (2012).

In the instant case, plaintiffs allege that when they were hired they were promised that they would be certified LEOs. That promise was made by Evans in her role as Commissioner of CDA. As noted above, she had authority under the municipal code to designate plaintiffs as special police officers. As such she is at least arguably able to bind the City in that promise. Consequently, the court concludes that Count IV states a claim against the City.

## CONCLUSION

For the reasons described above, the State defendants' motion to dismiss [Doc. 34] is granted and the State defendants are dismissed. The City defendants' motion to dismiss [Doc. 25] is granted as to Counts I and III, and denied as to Counts II and IV. The City is ordered to answer Counts II and IV on or before December 18, 2018. The parties are directed to file a joint status report using this court's form on or before December 21, 2018. This matter is set for a report on status on January 9, 2018, at 9:10 a.m.

**ENTER:** **November 27, 2018**

_____
**Robert W. Gettleman**
**United States District Judge**